UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BENJAMIN McCOY,

        Petitioner,

v.                                    CASE NO. 05-CV-71309-DT
                                      HONORABLE GEORGE CARAM STEEH
KURT JONES,

        Respondent.
_____/

**OPINION AND ORDER**
**(1) GRANTING PETITIONER'S APPLICATION TO FILE**
**A BRIEF IN EXCESS OF TWENTY PAGES,**
**(2) GRANTING IN PART AND DENYING IN PART**
**PETITIONER'S MOTION TO AMEND**
**OR CORRECT THE HABEAS PETITION, AND**
**(3) DENYING HABEAS CORPUS RELIEF**

This matter is pending before the Court on (1) three unresolved habeas claims about

Petitioner's trial attorney, (2) Petitioner's motion to amend or correct his habeas corpus petition,

and (3) Petitioner's application to file a supplemental brief in excess of twenty pages. The

application to file a brief in excess of twenty pages is granted, and the motion to amend is

granted in part and denied in part. The habeas claims are dismissed because Petitioner's

allegation that he was deprived of effective assistance of counsel lacks merit, and the state

appellate court's decision was not contrary to, or an unreasonable application of, Supreme Court

precedent.

**I. Background**

    **A. The Charges, Trial Testimony, and Sentence**

Petitioner was charged in Wayne County, Michigan with one count of first-degree

murder, two counts of assault with intent to commit murder, and one count of possessing a firearm during the commission of a felony (felony firearm).   The charges arose from an incident that occurred outside a club called the Dance Factory on June 4, 2000.  The prosecutor's theory was that Petitioner fired a rifle at Martel Wilson, Hombre Foster, and Quentin Leapheart on the corner of Harper Avenue and Phillips Street in Detroit.  Martel Wilson died from five gunshot wounds sustained in the shooting.  Hombre Foster also was hit by gunfire, but he survived, and Quentin Leapheart was unharmed.  The Michigan Court of Appeals summarized the testimony at trial as follows:

> Hombre Foster, the surviving victim, testified that he was upset with defendant, whom he personally did not know, because a few weeks before the shooting he was at the Dance Factory when defendant, without provocation, punched him. Defendant ran out of the club chased by Foster, [Martel] Wilson, and Quentin Leapheart.  Foster testified that on the night of the murder, he was again at the Dance Factory when he saw defendant.  A short confrontation occurred, and defendant and his associates left the club.  Thirty minutes later, Foster and Wilson went outside to meet Leapheart, who was driving them home.  They got into Leapheart's car and waited for another friend.  At this time, Foster saw defendant in a car which left and returned fifteen minutes later.  One of defendant's friends approached Leapheart's car; he turned and went back toward defendant. Defendant then left his car, ran toward Foster and his friends and began shooting. Foster and Leapheart ran from the car:  Leapheart escaped injury, Foster was struck by gunfire and Wilson . . . died as the result of five gunshot wounds.

> Quentin Leapheart gave a similar account of the events on the night in question. He acknowledged that the decedent had a .25 caliber handgun in his jacket pocket, but left it in the car when he entered the Dance Factory.  He testified that no one in his car fired a weapon at defendant.

> Kenya Carter, a cousin of one of defendant's friends, testified that when she left the club on the night of the shooting, she saw defendant walk toward her in the direction of the victims' car, carrying a long black gun.  After her cousin advised her to go back inside, Carter turned around and headed toward a building. According to Carter, defendant stated "You talking ____" to the individuals in the car before she heard gunshots.  Carter did not see anyone else shooting or with a gun.

The subsequent police investigation turned up ten fired cartridges at the crime scene; nine were fired from defendant's rifle and the tenth casing was fired from a different weapon. A police officer testified that when he reported to the crime scene, he saw a toy pistol on the back seat of the victims' car. The officer did not see a .25 caliber handgun in the car.

A Detroit Police Department investigator testified that defendant gave a custodial statement to her on August 3, 2000. In his statement, which was admitted into evidence at trial, defendant stated that a few weeks before the shooting he "got into it with some guys" while at the Dance Factory. On the night of June 3, 2000, defendant went to the club with two friends. There he saw the young man who was involved in the previous altercation. Defendant went out the back door and waited in the parking lot. Defendant then saw the young man with whom he had previously fought standing with his friends next to a car. Defendant stated that he heard someone say, "He got a gun." Defendant then returned to his own car, retrieved a rifle and ran back to "where the guys were." Defendant started shooting at the car. After firing five shots, defendant heard gunfire and started shooting again before he ran back to his car and drove away. Defendant estimated that he fired a total of seven to nine shots. Defendant claimed that he fired at the young men because his friend said "He got a gun." Defendant "got mad" and returned to his car to get his rifle. According to defendant, "I started shooting at them because I didn't want them to start shooting at us."

*People v. McCoy*, No. 234042, 2003 WL 21995222, at *1-2 (Mich. Ct. App. Aug. 21, 2003).

Petitioner did not testify or present any witnesses. His defense was that the shooting was done in self-defense and that the prosecutor failed to prove the elements of the offenses. Defense counsel argued that, at best, the evidence supported convictions for second-degree murder and assault with intent to do great bodily harm.

On March 1, 2001, the jury found Petitioner guilty, as charged, of one count of first-degree (premeditated) murder, MICH. COMP. LAWS § 750.316(1)(a), two counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and felony firearm, MICH. COMP. LAWS § 750.227b. The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by life imprisonment without the possibility of parole for the murder conviction and two parolable life sentences for the assault convictions.

## B.  The Post-Conviction Proceedings in State Court and Appeal

Petitioner moved for a new trial and an evidentiary hearing on his claim that his trial attorney was ineffective.  The trial court permitted Petitioner and his mother to testify at a hearing on the motion, but denied Petitioner's motion after concluding that trial counsel was not ineffective and that a full evidentiary hearing was unwarranted.

A three-judge panel of the Michigan Court of Appeals reversed Petitioner's murder conviction on the ground that the trial court did not properly instruct the jury on the elements of first-degree murder.  The court of appeals remanded the case for a new trial on the murder charge and for an evidentiary hearing on Petitioner's claim that his trial attorney failed to investigate and advance the self-defense theory and failed to file a pretrial motion to suppress Petitioner's custodial statement.  The court of appeals also vacated Petitioner's sentences for assault with intent to commit murder and remanded the case for re-sentencing on those counts.

The prosecutor appealed, claiming that the trial court's jury instructions did not require reversal and Petitioner was not entitled to an evidentiary hearing.  On January 9, 2004, the Michigan Supreme Court reversed the decision of the Court of Appeals and reinstated Petitioner's convictions and sentence.  The state supreme court was not persuaded that the jury instructions were erroneous or that defense counsel was ineffective.  *See People v. McCoy,* 469 Mich. 990; 672 N.W.2d 853, 853 (2004).[1]

## C.  The Federal Court Proceedings to Date

Petitioner filed a *pro se* habeas corpus petition in this Court on April 5, 2005.  He

---

[1] Justices Marilyn Kelly and Michael F. Cavanagh voted to deny the State's application for leave to appeal or to grant leave to appeal for a fuller discussion on the issue about the jury instruction for first-degree murder.

challenged the trial court's conduct, findings, rulings, and jury instructions, the sufficiency of the evidence, his trial attorney's representation, the absence of certain witnesses at trial, the cumulative effect of the trial errors, and his sentence. In an Opinion and Order dated July 19, 2007, the Court dismissed all of Petitioner's claims except three claims about his trial attorney. The Court appointed an attorney for Petitioner and held an evidentiary hearing on the unresolved claims about Petitioner's trial attorney. Petitioner recently moved to amend his habeas petition to add two new claims.

Respondent urges the Court to dismiss the entire case due to Petitioner's failure to exhaust state remedies for his two new claims. Petitioner replies that the Court should resolve all his claims on their merits or stay his case while he returns to state court and pursues an available remedy for his new claims.

## II. The Motion to Amend and Application to File a Brief More Than Twenty Pages in Length

### A. The Application

Petitioner seeks permission to file a supplemental brief exceeding twenty pages. Briefs filed in this District normally may not exceed twenty pages. *See* Local Rule 7.1(c)(3)(A) (E.D. Mich. Dec. 1, 2005). However, the Court held a lengthy evidentiary hearing in this case and counsel for Petitioner has not filed a brief in support of Petitioner's claims since being appointed to represent Petitioner. Accordingly, Petitioner's application to file a brief in excess of twenty pages [Dkt. 57, May 27, 2008] is GRANTED.

### B. The Motion to Amend

Petitioner seeks permission to amend his habeas petition to add the following new claims:

5

1.      Petitioner Benjamin McCoy was denied the effective assistance of counsel where trial counsel failed to perform a meaningful pretrial investigation.

2.      Petitioner  Benjamin McCoy was denied the effective assistance of counsel where appellate counsel failed to file a brief responding to the State's request for discretionary review in the Michigan Supreme Court.

The doctrine of exhaustion of state remedies requires state prisoners to exhaust available state remedies before seeking a federal writ of habeas corpus.  28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  Petitioner did not raise either of his two new claims on appeal from his convictions.  Consequently, if the Court were to allow him to amend his habeas petition, the petition would be a "mixed" petition of three exhausted claims and two unexhausted claims. Habeas petitions containing both unexhausted and exhausted claims ordinarily must be dismissed.  *Rose v. Lundy,* 455 U.S. 509, 522 (1982).  An exception exists where the claims lack merit.  28 U.S.C. § 2254(b)(2).

Petitioner's new claim about trial counsel lacks merit.  Therefore, Petitioner's motion to amend is GRANTED in part to permit Petitioner to argue that trial counsel was ineffective for failing to perform a meaningful pretrial investigation.  The Court excuses the exhaustion requirement as to that claim.

The Court denies Petitioner's motion to amend the habeas petition to include a claim that his appellate attorney was ineffective for not filing a response to the State's application for leave to appeal in the Michigan Supreme Court.  The facts underlying this claim differ in time and type from Petitioner's other claims, which challenge trial counsel's acts and omissions at the pretrial and trial stages of the case.  Therefore, the proposed new claim alleging ineffective assistance of appellate counsel does not relate back to the date of the habeas petition.  The claim is barred by

the one-year statute of limitations found in 28 U.S.C. § 2244(d)(1). Fed. R. Civ. P. 15(c); *Mayle v. Felix*, 545 U.S. 644, 650 (2005).

Petitioner contends that evidence supporting his claim was not available until July 14, 2007, when his current attorneys discovered that his appellate attorney prepared, but never filed, a response to the State's brief in the Michigan Supreme Court. Although Petitioner may not have discovered his former attorney's unfiled response until July 14, 2007, he appears to have known long before then that his appellate attorney did not file a response in the Michigan Supreme Court. He notes in his habeas petition that the State filed an application for leave to appeal in the Michigan Supreme Court and that his appellate attorney filed a motion for reconsideration after the state supreme court reversed the Michigan Court of Appeals. He also notes that the state supreme court's docket reflects his letter of inquiry about the case. It is obvious from these allegations that Petitioner had access to the Michigan Supreme Court's docket and knew what was filed and not filed in the case. Thus, Petitioner knew, or "could have . . . discovered through the exercise of due diligence," the factual predicate for his claim about appellate counsel. 28 U.S.C. § 2244(d)(1)(D). His argument that the one-year statute of limitations did not begin to run until July 14, 2007, lacks merit and is not a valid basis for a delayed start to the statute of limitations.

### III. Standard of Review

#### A. Generally

Habeas petitioners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on their merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. When no state court evaluated the merits of a petitioner's federal claim, the deferential standard of review mandated by 28 U.S.C. § 2254(d) does not apply, and habeas review of questions of law and mixed questions of law is *de novo. Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006) (quoting *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003), and citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

Petitioner alleges that the Michigan courts failed to adjudicate his claims on their merits and, therefore, the deferential standard of review under § 2254(d) is inapplicable. Although the

Michigan Court of Appeals did not adjudicate Petitioner's claims, the Michigan Supreme Court held that Petitioner "failed to meet his burden of proving that counsel's actions were ineffective and were not a matter of trial strategy." *McCoy*, 469 Mich. at 990; 672 N.W.2d at 853. This language reflects an evaluation of the merits of Petitioner's claims. The state supreme court not only addressed Petitioner's claims, it also provided a reason for its decision. *Cf. McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (declining to defer to the state court's decision because the state court never directly addressed the issue and there was neither a result, nor reasoning, to which the Sixth Circuit could defer). Therefore, this Court's review of Petitioner's claims first three claims about trial counsel is circumscribed by the Michigan Supreme Court's decision.

No state court has adjudicated Petitioner's new claim that trial counsel failed to perform a meaningful pretrial investigation. Thus, the deference due under § 2254(d) is not applicable to that claim, and review is *de novo*. "That independent review, however, is not a full, de novo review of the claim[], but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).

### B. Ineffective-Assistance-of-Counsel Claims

The issue in this case is whether Petitioner's trial attorney was ineffective. The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), qualifies as "clearly established federal law" under 28 U.S.C. § 2254(d)(1) for purposes of evaluating ineffective-assistance-of-counsel claims. *Williams v. Taylor*, 529 U.S. at 391. The Supreme Court explained in *Strickland* that to prevail on a claim of ineffective assistance, a petitioner must show that "that counsel's performance was deficient" and "that the deficient performance prejudiced

the defense." *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id*. at 690.

## IV. Discussion

### A. Failure to Investigate and Advance a Claim of Self Defense

Petitioner alleges that his attorney failed to properly investigate and advance a claim of self defense.

#### 1. Legal Framework

The Supreme Court explained in *Strickland* that

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Stated differently, attorneys have "a duty to make all reasonable efforts to learn what they [can] about the offense," *Rompilla v. Beard*, 545 U.S. 374, 385 (2005), and an "obligation to investigate all witnesses who may have information concerning his or her client's guilt of innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In assessing the reasonableness of an attorney's investigation . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

### 2. Application

Petitioner's trial attorney, Jeffrey Schwartz, conceded during opening statements that Petitioner shot and killed one young man and injured another young man. Mr. Schwartz went on to say that the jury would have to decide whether Petitioner was guilty of second-degree murder or another lesser-included offense or whether he acted in self defense.

Mr. Schwartz did not present any witnesses in support of the defense theory. However, in his closing argument, he maintained that the evidence did not support the charges of first-degree murder or assault with intent to murder and that the jury should find Petitioner not guilty because he acted in self defense. Mr. Schwartz pointed out that the victims disposed of a gun

and at least one other weapon must have been fired, because one casing did not match the other casings found at the scene. He concluded from this evidence that one gunshot came from the opposite direction.

Mr. Schwartz testified at the federal evidentiary hearing that he hesitated to put Petitioner on the witness stand because he did not think that Petitioner could handle the prosecutor's cross-examination. Mr. Schwartz had thought that they could advance a theory of self-defense by using Petitioner's statement to the police, because Petitioner informed the police that he acquired a gun after he heard that someone else had a gun. Petitioner also informed the police that he did not mean to kill anyone, that he was sorry, and that he fired at the victims because he feared he and his friends would be shot.

The pretrial investigation produced no evidence that Petitioner was provoked or that force was used against him. The facts suggested that he had an opportunity to retreat, but chose to arm himself and return to the group of people whom he allegedly feared. Given the strength of the evidence against Petitioner and the fact that he might have done more harm than good by testifying, defense counsel performed adequately in advancing a theory of self-defense.

Petitioner nevertheless claims that defense counsel should have investigated the case more thoroughly and produced Robert Carter and Roberto Carter to support his defense theory. Petitioner asserts that the Carters would have discredited the prosecution's main witnesses and shown that he acted in response to a reasonable belief that his life was in danger and that he could not have safely fled.

### 3. The Record and Testimony at the Federal Evidentiary Hearing

The record indicates that the police could not locate either Robert Carter or his twin

brother, Roberto Carter.  Their aunt and a police officer testified at a due diligence hearing during trial that the Carters' mother declined to provide any information about her sons.  According to the police officer, the mother did not want her sons to testify against Petitioner, whom they had known since childhood and who lived across the street from them.  The trial court struck the Carters from the prosecution's witness list after concluding that the prosecution had exercised due diligence in producing them.

### a. Roberto Carter

At the evidentiary hearing in this Court, Roberto Carter testified that no one contacted him about testifying at trial, that he did not receive any mail about the trial date, and that he did not know the prosecutor or police were trying to reach him.  He claimed that he would have testified in Petitioner's behalf at trial if he had been asked to do so, and he denied stating in an affidavit signed in 2002 that the reason he did not testify at trial was that he feared for his life.

Roberto went on to say that he was present with Petitioner on the night of the shooting.  When Petitioner emerged from the Dance Factory, he told Roberto that he had "gotten into it" with some guys.  Roberto advised Petitioner to "be cool."  Then Roberto heard nine to ten gunshots.  He could see the muzzle of a gun and gunfire coming from a window in the Dance Factory.  He did not recall any gunshots coming from the area where people were standing on the corner, and he did not know Petitioner's location when he heard the gunshots.

Although Roberto stated in his affidavit that Hombre Foster had fired a gun at Petitioner and had threatened to kill them, he admitted that he did not tell the police about the other gunshots or that gunshots had come from the building.  According to him, the police did not question him about those things; they asked whether Petitioner was shooting, and they did not

13

seemed to be concerned about anything else.

### b. Robert Carter

Robert Carter testified at the hearing that he, too, would have testified for Petitioner, but he was never contacted by the police or the prosecutor and he did not receive a notice of Petitioner's trial date. He stated that he would not have been afraid to testify at trial even though an affidavit bearing his signature and a date of May 16, 2002, stated that he did not testify because he feared for his life.

Robert contradicted his own statement to the police by testifying that a man with a gun got out of the victims' car and that he heard gunshots before he saw Petitioner with a gun. He claimed that he told the police about seeing one of the men with a gun, but the officer had said, "No, that's not how it goes. This is what we are going to do." He also claimed that he signed his statement because the police threatened to charge him as an accessory to the crime if he did not sign the statement.

### c. Ora Parker and Carol Vaughn

Robert and Roberto Carter's mother, Ora Parker, testified that she took her sons to the police station in June of 2000, but she did not receive notice of the trial date and she did not have a conversation with anyone about trying to locate her sons. She did not tell anyone that the police would have to find her sons on their own, and she would have permitted her sons to testify in Petitioner's behalf if his attorney had contacted her.

Petitioner's mother, Carol Vaughn, testified at the federal hearing that she thought that the Carters were valuable witnesses. She admitted, however, that the Carters did not attend Petitioner's preliminary examination or trial.

#### d.  Petitioner and his Trial Attorney

Petitioner testified that he informed his trial attorney about the Carters, but his attorney told him the Carters would not help him and that they were on the prosecution's side. Petitioner asserted that the Carters would have testified for him at trial if they had been notified, but he admitted that their statements to the police did not mention any shots being fired from the Dance Factory or that Petitioner was shot first.

Petitioner's trial attorney, Jeffrey Schwartz, testified that he did not make an effort to speak with the Carters because they were the prosecutor's witnesses.  He had read their statements to the police, knew what they were expected to say at trial, and was not informed that they were going to resist testifying.  He did not insist on the Carters' attendance when the police were unable to find them, because he did not believe their testimony would be entirely favorable to Petitioner and because he thought he could proceed without their testimony.  He would have produced any witnesses who were totally favorable to Petitioner and had not made any prior inconsistent statements.

### 4.  Analysis and Conclusion

The Carter brothers and their mother were not credible when they testified that they were unaware of efforts to have the brothers testify at trial.  Ms. Parker's testimony on that point flatly contradicted what her sister and a police officer said at the due diligence hearing during trial.

The Carters' testimony was suspect for additional reasons.  Roberto Carter's testimony that gunshots came from the Dance Factory was contrary to the evidence at trial.  Robert Carter's testimony that he heard gunshots before he saw Petitioner with a gun conflicted with the evidence at trial and his own statement to the police.  Furthermore, he claimed that he did not

recall signing his affidavit, which was favorable to Petitioner.

Petitioner's testimony was contrary to the eyewitness testimony at trial and his statement to Investigator Simon. If the Court were to believe Petitioner, the Carters, and Ora Parker, the Court would have to conclude that everyone who testified at trial or during the due diligence hearing conspired to mischaracterize the facts.

Petitioner's trial attorney made a reasonable decision that further investigation was unnecessary. Counsel's decision not to investigate was reasonable because he had no reason to question the authenticity or accuracy of the prosecution's evidence. *Eady v. Morgan*, 515 F.3d 587, 598 (6th Cir. 2008) (citing *United States v. Cronic*, 466 U.S. 648, 664 (1984)), *petition for cert. filed*, (U.S. August 14, 2008) (No. 08-5906). The Carters could not be found, they obviously were unwilling to testify at trial, and their pretrial statements to the police suggested that their testimony would not have been favorable to Petitioner. If the Carters had testified and supported the defense theory, the prosecutor could have attacked their credibility by impeaching them with their prior inconsistent statements to the police.

Given the quantum of evidence known to defense counsel before trial, he employed a reasonable trial strategy by foregoing efforts to speak with the Carters and use them as witnesses. Counsel's investigation and presentation of the self-defense theory was adequate and did not amount to ineffective assistance of counsel.

### B. Discouraging Petitioner from Testifying

Petitioner alleges next that his attorney interfered with his right to testify and gave him bad advice not to testify.

### 1. Legal Framework

Defendants in criminal cases have a constitutional right to testify. *Rock v. Arkansas*, 483

U.S. 44, 51-53 (1987). Any relinquishment of the right must be knowing and intentional.

*United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). Defense counsel's role is to advise the

defendant whether to testify, but the ultimate decision is for the defendant to make. *United*

*States v. Hover*, 293 F.3d 930, 934 (6th Cir. 2002).

> [W]hen a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is "strongly presumed to have rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."

*United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000) (footnote and citations omitted).

Petitioner did not merely remain silent on this issue at trial, he actually waived his right

to testify on the record. The colloquy went as follows:

> MR. SCHWARTZ (defense counsel, addressing the trial court): I've had an opportunity to discuss this matter with my client, and because of his young age, with his parents.

> I've indicated to them that I don't know what you're going to do in terms of what you already stated on the record, whether or not you're going to instruct on Manslaughter or not, depending on whether he testifies.

> But we've discussed the strategy, and we've discussed whether it would be good for him to testify, or bad for him to testify.

> Mr. McCoy understands that you may still, even if he doesn't testify, decide that you're not going to instruct on Manslaughter. So, that shouldn't have a bearing on his decision.

> But he has decided that he does not want to testify.

> Is that correct, Mr. McCoy?

> DEFENDANT McCOY: Yes.

> MR. SCHWARTZ:  And that would be even if the Judge makes the decision that he's not going to instruct on manslaughter?
>
> DEFENDANT McCOY:  Yes.
>
> MR. SCHWARTZ:  So, you understand that you can't come back later on and say that, "I want to testify because now I know the Judge isn't going to instruct on Manslaughter.
>
> You're aware of that, right?
>
> DEFENDANT McCOY:  Yes.

(Tr. Mar. 1, 2001, at 84-86.)  Petitioner claims that his waiver was involuntary because the decision not to testify was based on his attorney's bad advice and on the fact that defense counsel persuaded his mother to tell him not to testify.

### 2.  The State Hearing

Petitioner's mother, Carol Vaughn, testified at the state evidentiary hearing on February 1, 2002, that defense counsel had promised to approach the trial court and ask for manslaughter if Petitioner did not testify.  Based on this advice, she instructed Petitioner not to testify.

Petitioner testified at the hearing that he had planned to testify at trial, but his attorney and mother told him not to testify and his attorney had said that he would be charged with, or found guilty of, manslaughter.  Petitioner claimed that if he had testified at trial, he would have advanced a self-defense theory (that he was shot first) and he would have said that there were inaccuracies in his statement to Investigator Simon.

The trial court opined at the conclusion of the hearing that defense counsel did not stop Petitioner from testifying and that, if Petitioner had wanted to testify, he would have testified. The trial court said that it was trial strategy not to have Petitioner testify and that there was no

evidence of ineffective assistance.

### 3. The Federal Evidentiary Hearing

Carol Vaughn testified at the federal evidentiary hearing that she retained Jeffrey Schwartz to represent her son at trial. Before trial she thought that Petitioner would testify, but the attorney had said it would be best if Petitioner did not testify.

Mr. Schwartz testified that he had met with Petitioner and his mother several times to discuss the issues. There was no question that the defense would be self-defense; the only question was how to present the defense. Petitioner was young and immature then, and because he exhibited a temper at times during their preparation for trial and in the courtroom, Mr. Schwartz was worried about whether he would be able to handle cross-examination. Petitioner did not react well when they conducted a mock cross-examination.

Mr. Schwartz thought that they had a unique situation where they could advance the theory of self-defense without putting Petitioner on the stand. The prosecutor had hinted that he would admit Petitioner's statement to the police in evidence, and although Petitioner admitted in the statement that he did the shooting, the statement could be used to present the defense of self-defense. Petitioner had told the police that he acquired the gun after he heard someone else had a gun. He also stated to the police that he was sorry and did not mean to kill anyone and that he fired at the victims because he was afraid they would shoot him and his friends. For this reason, Mr. Schwartz had recommended that Petitioner refrain from testifying, but he informed Petitioner and his mother that the decision was theirs to make. The dilemma was whether to rely on Petitioner's statement to the police, which was not perfect, or to have Petitioner testify and possibly risk damaging his case.

Mr. Schwartz testified that he had explained to Petitioner and his mother that, if the trial court gave a jury instruction on manslaughter, he could still argue the defense without Petitioner having to testify. However, he never told them that the court would instruct on manslaughter if Petitioner did not testify. The jury instructions were just another factor to consider when deciding whether Petitioner should testify. If the prosecutor had not admitted Petitioner's confession, he would have recommended that Petitioner testify.

Petitioner testified at the hearing that he was not an aggressive person and does not respond to questions with an angry outburst. He stated that he had become agitated with his attorney because the attorney kept trying to make him plead guilty when he was not guilty of murder and never intended to kill anyone. He claimed that he declined to testify because his attorney and mother told him not to testify and because he thought that he would be charged with manslaughter if he did not testify. At the time, he did not understand the difference between a charge and an instruction. He answered "yes" to all his attorney's questions during the colloquy on his right to testify because that was what his attorney told him to say.

### 4. Conclusion on the Right-to-Testify Claim

The state court record and the testimony taken in this Court indicate that Petitioner was advised of his options, the benefits and risks of testifying, and that the decision whether to testify was his to make. He opted not to testify.

Furthermore, the advice not to testify was reasonable. Petitioner was young and immature at the time and exhibited a temper at times, according to his attorney. His statement to the police provided some basis for advancing the defense theory, because he had informed the police that he acquired a gun and started shooting after he saw someone else with a gun and

because he feared being shot.  If Petitioner had wanted to testify, he could have rejected his

attorney's advice "by insisting on testifying, speaking to the court, or discharging his lawyer."

*Joelson*, 7 F.3d at 177.  Waiver of the right to testify "is presumed from [his] failure to testify or

notify the trial court of the desire to do so."  *Webber*, 208 F.3d at 551 (citing *Joelson*, 7 F.3d at

177).  The Court concludes that defense counsel did not interfere with Petitioner's right to

testify, and he was not ineffective for advising Petitioner not to testify.

### C.  Failure to File a Motion to Suppress Petitioner's Confession

Petitioner's third claim about his trial counsel alleges that counsel should have moved to

suppress his statement to the police on the grounds that the statement was involuntary and a

violation of his Fifth Amendment right to remain silent.  He claims that his statement was

involuntary because a police officer punched him and told him that he could not have an attorney

until his preliminary examination.  According to Petitioner, the officer also would not allow him

to call his mother or an attorney and informed him that he would be held in the interrogation

room all night.

Petitioner alleges that his statement violated the Fifth Amendment because the police did

not scrupulously honor his right to remain silent after he invoked the right.  He claims that he

was interrogated by Investigator Barbara Simon a few minutes after he informed a stocky, male

officer that he wanted an attorney and did not wish to speak to the officer.

### 1.  Supreme Court Precedent

A confession is voluntary if it is "the product of an essentially free and unconstrained

choice by its maker," *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), or if the individual

"'voluntarily, knowingly and intelligently' waives his constitutional privilege."  *Colorado v.*

*Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Courts look to the totality of the circumstances to determine whether a suspect's will to resist

was overborne and resulted in an involuntary confession. *Ledbetter v. Edwards*, 35 F.3d 1062,

1067 (6th Cir. 1994).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not

'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."

*Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Whether an interrogation rises to the level of

coercion turns on a spectrum of factors: the age, education and intelligence of the suspect;

whether the suspect was advised of his *Miranda* rights,; the length of the questioning; and the

use of physical punishment or the deprivation of food, sleep or other creature comforts."

*Jackson v. McKee*, 525 F.3d 430, 433-34 (6th Cir. 2008)(citing *Schneckloth v. Bustamonte*, 412

U.S. 218, 226 (1973)).

To protect the Fifth Amendment right to remain silent, an accused must be warned before

any questioning

> that he has a right to remain silent, that any statement he does make may be used
> as evidence against him, and that he has a right to the presence of an attorney,
> either retained or appointed. The defendant may waive effectuation of these
> rights, provided the waiver is made voluntarily, knowingly and intelligently. If,
> however, he indicates in any manner and at any stage of the process that he
> wishes to consult with an attorney before speaking, there can be no questioning.

*Miranda*, 384 U.S. at 444-45. A valid waiver of the right to have counsel present during

custodial interrogation,

> cannot be established by showing only that [the accused] responded to further
> police-initiated custodial interrogation even if he has been advised of his rights.
> [A]n accused . . . having expressed his desire to deal with the police only through
> counsel, is not subject to further interrogation by the authorities until counsel has
> been made available to him, unless the accused himself initiates further

22

communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (footnote omitted).  In other words, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."  *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

### 2.  The Relevant Trial Testimony

Petitioner was twenty-one years old at the time of his arrest, and he had no criminal record.  Investigator Barbara Simon testified at trial that she advised Petitioner of his constitutional rights on August 3, 2000.  Petitioner stated that he understood his rights, and he signed the waiver-of-rights form at 10:20 a.m.  He did not appear to be under the influence of drugs or alcohol.  Nor he did not appear to be illiterate.

Petitioner did not say that he was unwilling to talk with her or that he wanted a lawyer before speaking with her.  However, she did not know how long Petitioner had been in custody before she spoke with him, and she did not know whether any other officers had spoken with Petitioner before she did.

The record indicates that, at the conclusion of his statement, Petitioner said that Investigator Simon did not threaten him or promise him anything to induce him to make a statement or answer any questions.   He also said that he was not deprived of water, food, or the use of a restroom and was not taking any medication.  According to Investigator Simon, Petitioner had an opportunity to read what she had written.  He then made some changes and signed the statement.

### 3.  The State Hearing

Petitioner testified at the post-conviction hearing in state court that he spoke to a stocky, brown-skinned officer at police headquarters following his arrest.  He told the officer that he wanted to see a lawyer.  The officer told him that he would not have a lawyer until the preliminary examination and that he may as well go ahead and tell the officer what happened.  The officer took him to a room where he hit Petitioner and said that he did not have time to play games with him.  Then the officer took him to the ninth floor.  The next morning, the stocky officer came and took him to the same room where they had been the night before.  He again told the officer that he wanted a lawyer and had nothing to say.  After the officer walked out of the room, Investigator Simon walked in and interrogated him.  He later told his trial attorney about his first statement to the stocky officer, but his attorney said that it would be a waste of time to file a motion.

### 4.  The Federal Hearing

Petitioner's testimony at the hearing in this Court was similar to his testimony on this issue at the state court hearing.  In addition, Petitioner claimed to have told the stocky, brown-skinned officer that someone shot at him and he shot back.  The officer allegedly responded that he had recorded everything.  Petitioner also testified that he told Investigator Simon he had nothing to say and wanted an attorney.  According to him, Simon said that he was not getting an attorney and that he could not call his mother.  Later, when his family retained counsel, he informed Mr. Schwartz about his two statements to the police, but Mr. Schwartz said that it would be his word against theirs and a waste of time to file a motion to suppress his statement.

Mr. Schwartz admitted at the federal hearing that Petitioner had told him about another statement besides the one given to Investigator Simon.  However, Mr. Schwartz spoke with the

prosecutor's office and was unable to confirm that there was another statement. He had a good relationship with the prosecutor's office at the time because he was a former prosecutor himself.

Mr. Schwartz also testified that Petitioner never told him that an officer hit him or that he had asked for an attorney. Schwartz claimed that, if he had been informed of these things, he would have filed a motion to suppress the statement, and although he might tell a client that a motion is inappropriate, he would never say something is a waste of time.

### 5. Analysis and Conclusion

The Court found Mr. Schwartz to be credible when he testified that he was not told about Petitioner being struck by a police officer at police headquarters. Furthermore, there is no evidence, other than Petitioner's self-serving testimony, that he was interrogated before Investigator Simon spoke to him or that his statement to her was coerced. He stated at the conclusion of his interview with Investigator Simon that he was not threatened or promised anything for his statement, and he admitted in this Court that Officer Simon read his constitutional rights to him.

The record indicates that Petitioner's will was not overcome and that he voluntarily, knowingly, and intelligently made a statement to Investigator Simon. The record further indicates that Petitioner's Fifth Amendment right to remain silent was not violated. He waived his right to remain silent and his right to have an attorney present during the only known pretrial interrogation.

### D. Failure to Perform an Adequate Pretrial Investigation

Although Petitioner's first claim about trial counsel alleges that his attorney failed to properly investigate and advance a claim of self defense, his new claim asserts that defense

counsel's decision to pursue a self-defense theory was unreasonable. Petitioner contends that, if his attorney had properly investigated the case, he would have realized that there was a viable defense that an unidentified person shot Martel Wilson from the second floor of the Dance Factory.

"[D]efense attorneys have a constitutional duty to conduct adequate factual investigations." *Joseph v. Coyle*, 469 F.3d 441, 460 (6th Cir. 2006), *cert. denied sub nom Houk v. Joseph*, __ U.S. __, 127 S. Ct. 1827 (2007). However, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

Defense counsel's failure to argue that there was an unidentified gunman, who was shooting from the Dance Factory did not amount to ineffective assistance because there was no evidence to support that theory. Robert Carter and Roberto Carter informed the police on the day of the shooting that Petitioner fired at the victims. The eyewitnesses who testified at trial also implicated Petitioner as the shooter. Petitioner himself admitted in his statement to the police that he fired at the victims before he heard any other gunfire and that the only other person with a gun did not point a gun at him, but was holding the gun down by his side. He claimed at the post-conviction hearing in state court that he fired in self-defense because the victims shot at him first.

The testimony of Robert Carter and Roberto Carter at the federal evidentiary hearing was not credible because it contradicted their statements to the police that Petitioner was the only shooter. Roberto Carter testified that he did not tell the police about the person shooting from

the Dance Factory because the police did not ask about other shooters.  However, he claimed that he would do everything he could to help Petitioner, whom he had known for eighteen or nineteen years.

Furthermore, Martel Wilson was shot five times:  twice in the head, once on the right side of his body in the abdominal area, once on his right thigh, and once in his left buttock.  Although there was no evidence at trial that it was a close-range shooting, it is unlikely that a person shooting from the second floor of the Dance Factory could have hit Martel five times while he was seated in a car across the street from the club.  He was seated on the passenger side of the car.  Regardless of the direction that the car was facing, it is not plausible that someone shooting from the second floor of a building across the street could have hit him twice in the head and three times in his mid-section.

To conclude, a more thorough pretrial investigation would not have been a promising avenue of investigation.  Eyewitnesses to the crime identified Petitioner as the shooter, and the suggestion that someone shot Martel Wilson from a second-story window of the Dance Factory was not believable.  Therefore, defense counsel was not ineffective for failing to investigate and advance a theory that an unidentified person shot Martel from across the street.

## V.  Conclusion

The Michigan Supreme Court concluded that Petitioner was not deprived of his right to effective assistance of counsel.  This conclusion was not contrary to, or an unreasonable application of, *Strickland*.  Consequently, Petitioner has no right to relief on his claims that trial counsel was ineffective for failing to investigate a theory of self defense, for advising him not to testify, and for failing to move to suppress his statement to the police.  Petitioner's new claim

that his trial attorney failed to investigate the possibility that a third person killed Martel Wilson

lacks merit because, at the time, there was no evidence to support that theory.  The application

for a writ of habeas corpus is **DENIED**, and this case is **DISMISSED**.

Dated:  September 10, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 10, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk